USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-13-15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILSON DIAZ,

                   Plaintiff,

- against -

COMMISSIONER OF SOCIAL SECURITY,
                   Defendant.

**REPORT AND RECOMMENDATION**

**13-CV-7282 (JMF) (RLE)**

To the HONORABLE JESSE M. FURMAN, U.S.D.J.

## I. INTRODUCTION

Plaintiff Wilson Diaz commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability benefits. Diaz argued in his October 15, 2013 Complaint that the administrative law judge ("ALJ") failed to properly evaluate the opinion of his treating psychiatrist and failed to properly develop the record as to his intellectual functioning. Diaz asks the Court to modify the Commissioner's final decision of September 11, 2013, to grant him maximum monthly Supplemental Security Income Benefits or, in the alternative, to remand for further administrative proceedings and reconsideration of the evidence. The Commissioner answered Diaz's Complaint on May 23, 2014, and filed a Motion for Judgment on the Pleadings on October 28, 2014. Diaz did not file a response.

For the reasons that follow, I recommend that the Commissioner's motion be **GRANTED** and the Complaint **DISMISSED**.

## II. BACKGROUND

### A. Procedural History

Diaz filed an application for supplemental security income on January 18, 2011. The claim was denied by the Social Security Administration on May 6, 2011. (Trial Transcript

("Tr.") at 87.) Diaz requested a hearing before an Administrative Law Judge ("ALJ") on June 24, 2011 (Tr. at 95-97.), and that hearing was held before ALJ Mark Solomon on April 27, 2012. (Tr. at 46-68.) A supplemental hearing was held before ALJ Solomon on June 26, 2012. (Tr. at 36-45.) ALJ Solomon issued his decision on July 11, 2012, finding that Diaz was not disabled under § 1614(a)(3)(A) of the Social Security Act. (Tr. at 30.) Diaz requested review of the decision by the Appeals Council on August 29, 2012. (Tr. at 16-17.) The Appeals Council denied review on September 1, 2013 (Tr. at 1-4.), and Diaz filed this action on October 15, 2013.

## B. The ALJ Hearing

### 1. Diaz's Testimony

Diaz appeared at a hearing before ALJ Mark Solomon on April 27, 2012. Also present were Diaz's attorney, Ryan Peterson, and Dr. Gerald Belchick, a vocational expert.

Diaz was born on November 10, 1969, making him forty-two years old at the time of the hearing. (Tr. at 51.) He graduated from a special education elementary school, but did not finish high school, does not possess an equivalency diploma and, at the time of his testimony, was not enrolled in any vocational or educational programs. (Tr. at 51-52.) It is unclear when Diaz last worked, but it was no later than 2004. He was at one time a laborer engaged primarily in loading and unloading trucks. (Tr. at 53-54.) His employment ended with a layoff. (Tr. at 54.)

During the summer of 2000, Diaz was diagnosed with Hepatitis C. (*Id.*) He currently takes vitamins to treat the Hepatitis C, meets with a psychiatrist every month, and sees a therapist weekly. (Tr. at 55-56.) Although he has a history of alcohol and cocaine use, prior to the date of his testimony, Diaz did not use cocaine for one year and did not use alcohol for three months. (Tr. at 55.) He was arrested during 2011 on an open container charge. (*Id.*)

2

Diaz is able to travel using public transportation, but relies on his mother's assistance to map out his trips, and sometimes relies on strangers to tell him when he has arrived at his stop. (Tr. at 56.) Diaz lives with his mother and her husband, and can dress, bathe and feed himself. (Tr. at 57.) He is able to shop alone if close to his home, but sometimes requires the assistance of a friend or his brother. (*Id.*) He has no difficulty using his hands and arms, but his legs occasionally get "shaky" and "weak." (*Id.*) Diaz's leg issues make it difficult for him to walk and he cannot remain standing for more than an hour. (*Id.*) He experiences back pain at least once every hour and cannot remain seated for more than two or three hours at a time. (Tr. at 58.)

Diaz enjoys collecting comic books and is a visual artist who draws on a daily basis. (Tr. at 58-59.) He helps his mother around the house, and on the day of his testimony, had a girlfriend within walking distance of his home with whom he spent his weekends. (Tr. at 59.)

Diaz takes medication for auditory hallucinations and it makes him drowsy. He also takes sleeping pills. (Tr. at 60.) Diaz has a duodenal ulcer that causes him pain every ten to twenty minutes. His pain is worsened by physical exertion. He also loses his breath rapidly upon exertion because of poor blood circulation. (*Id.*)

Diaz enjoys watching television, especially animated comedies, and enjoys laughing and pursuing his artistic interests. (Tr. at 61.) In the year prior to the administrative hearing, Diaz was hospitalized because of a heart condition. (Tr. at 61-62.) At the time of his testimony, Diaz had been recently prescribed two new medications, but was too afraid to take them. (Tr. at 62.)

### 2. Vocational Expert's Testimony

Following Diaz's testimony, the ALJ examined vocational expert Dr. Gerald Belchick. However, Dr. Belchick's testimony was subsequently found to be inaccurate, and a new vocational expert, Helene Feldman, was examined on June 26, 2012.

Feldman testified that, if Diaz's residual functional capacity ("RFC") restricted him to light work only, then he would be unable to do his past relevant work. (Tr. at 39.) However, if Diaz could perform light work, and was able to remember, understand, carry out simple instructions, make simple work-related decisions, maintain attention and concentration, and maintain a regular schedule, he could be a successful mailroom clerk, laundry bagger or messenger. (Tr. at 41.)

Feldman testified that there would be no job Diaz could perform if he could not maintain a schedule unsupervised, work in coordination or in proximity with others without being distracted, make simple, work-related decisions, complete a normal workday, accept instruction and respond appropriately to supervisors, adapt to the workplace or interact with others. (Tr. at 42.) Additionally, if Diaz were likely to be absent three days per month, Feldman testified that he would be unable to find and maintain gainful employment. (Tr. at 43.)

### 3. Medical Evidence Presented

#### a. Dr. Luiza Guseynov

Diaz first visited Dr. Luiza Guseynov on January 28, 2010, complaining of chest pain and shortness of breath. (Tr. at 460-64.) Dr. Guseynov diagnosed Diaz with chest pain, hypertension, pure hypercholesterolemia,[1] alcohol abuse, anemia, and tobacco-use disorder. She prescribed medication, referred Diaz to a cardiologist, and told him to stop smoking. On February 24, 2010, Dr. Guseynov diagnosed Diaz as suffering from Hepatitis C and hypertrigliyceridemia.[2] (Tr. at 456-57.)

---

[1] "Hypercholesterolemia" is defined as an excess of cholesterol in the blood. *Dorland's Illustrated Medical Dictionary*, 792 (28th ed. 1994).
[2] "Hypertrigliyceridemia" is defined as an excess of triglycerides in the blood. *Dorland's* at 802.

On June 28, 2010, Dr. Guseynov diagnosed Diaz with hyperkalemia.[3] (Tr. at 449-50.) On December 6, 2010, she added hyperlipidemia[4] and hypothyroidism.[5] (Tr. at 445-46.) On January 8, 2011, she found Diaz was suffering from glucose intolerance. Diaz last saw Dr. Guseynov on December 20, 2011, when he complained of chest pain and shortness of breath, which was substantiated on examination.

Dr. Guseynov completed a "physician's report on disability due to physical impairment" for Diaz on December 21, 2011, diagnosing Diaz with hypertension, hyperlipidemia, alcohol abuse, GERD,[6] glucose intolerance, peptic ulcer disease, and depression. (Tr. at 723.) Dr. Guseynov stated that Diaz's condition could be expected to last at least twelve months, and that his ulcer and GERD caused or could cause epigastric[7] pain. (Tr. at 724.)

### b. Federation of Employment and Guidance Service ("FEGS")

Diaz visited FEGS for biopsychosocial assessments on April 23, 2009, and July 16, 2010. (Tr. at 296-312, 313-38.) In both sessions, he reported that he could speak English, but varied in his reports about his abilities to read and write. (Tr. at 297, 314.) Diaz reported in 2010 that he was treating his alcohol abuse in an out-patient program. (Tr. at 322.) He reported auditory hallucinations; feeling down, depressed and hopeless on most days; having little pleasure or interest in doing things; having trouble falling asleep; feeling tired; having low self-esteem; and having trouble concentrating. (Tr. at 323-24.) FEGS diagnosed Diaz with lower extremity pain, depression and auditory hallucinations. (Tr. at 324, 337-38.)

---

[3] "Hyperkalemia" is defined as an abnormally high potassium concentration in the blood. *Dorland's* at 795.
[4] "Hyperlipidemia" is defined as elevated concentrations of any or all of the lipids in the plasma. *Dorland's* at 795.
[5] "Hypothyroidism" is defined as a condition caused by excessive production of iodinated thyroid hormones. *Dorland's* at 802.
[6] "GERD" is defined as Gastroesophogeal Reflux Disease, also known as "acid reflux." *Dorland's* at 688.
[7] "Epigastric" is defined as pertaining to the upper middle region of the abdomen. *Dorland's* at 566, 1441.

5

### c. Dr. Luis Gonzalez

Dr. Luis Gonzalez began treating Diaz on November 19, 2010, and diagnosed him with depression. Dr. Gonzalez found that Diaz would be unable to work for at least twelve months. (Tr. at 592, 690-91.) On November 4, 2011, after about one year of treatment, he diagnosed Diaz with major depressive disorder and anxiety, and recommended treatment with medication. (Tr. at 568-89.)

Dr. Gonzalez completed a "report for claim of disability due to mental impairment" for Diaz on January 6, 2012, where he indicated the same diagnoses of major depressive disorder and anxiety. (Tr. at 554-61.) He noted that Diaz's primary symptoms included sadness, poor appetite, poor sleep, low energy, forgetfulness and poor social interaction. (Tr. at 555.) Dr. Gonzalez found that Diaz was markedly limited in his abilities to:

> 1) remember locations and work-like procedures;
> 2) understand and remember short and simple instructions;
> 3) understand and remember detailed instructions;
> 4) maintain attention and concentration for extended periods;
> 5) perform activities within a regular schedule, maintain regular attendance, and be punctual within customary tolerances;
> 6) sustain an ordinary routine without supervision;
> 7) work in coordination with or in proximity to others without being distracted by them;
> 8) make simple work-related decisions that are commensurate with the functions of unskilled work;
> 9) routinely complete a normal workday without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable lengthy rest period;
> 10) interact appropriately with the general public;
> 11) ask simple questions or request assistance;
> 12) accept instructions and respond appropriately to criticism from supervisors;
> 13) get along with co-workers or peers without distracting them or exhibiting behavioral extremes;
> 14) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;
> 15) respond appropriately to changes in the work setting;
> 16) be aware of normal hazards and take appropriate precautions;
> 17) travel in unfamiliar places or use public transportation; and
> 18) set realistic goals or make plans independently of others.

Dr. Gonzalez completed a psychiatric and psychological impairment questionnaire for Diaz on March 2, 2012, in which he diagnosed major depressive disorder and anxiety disorder. (Tr. at 759-66.) He found Diaz to be markedly limited in his ability to interact with the general public and complete a normal workweek without interruptions from psychologically-based symptoms. He found marked limitation in Diaz's ability to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) He also found Diaz to be moderately limited in each of the eighteen categories that he found him to be markedly limited in on January 6, 2012. (Tr. at 759-66.)

Dr. Gonzalez found that Diaz's anxiety caused him episodes of deterioration or decompensation[8] in work and work-like settings. (Tr. at 764.) As a result, Dr. Gonzalez concluded that Diaz would be incapable of tolerating even low work stress. (Tr. at 765.)

### d. Dr. Arlene Broska, Ph.D.

On March 15, 2011, Dr. Arlene Broska conducted a psychiatric consultative examination of Diaz. (Tr. at 482-86.) Dr. Broska found that Diaz possessed an "adequate" capacity for relation, social skills and presentation. She also found him to be of neutral mood, with intact attention and concentration, but opined that Diaz's intellectual functioning was below average, and that he possessed poor insight and judgment. (Tr. at 484.) Dr. Broska diagnosed Diaz with depressive disorder and alcohol abuse in early remission. She found that Diaz had a suitable capacity to follow and understand simple directions and instructions; to perform simple tasks independently; to maintain attention and concentration; to remember; to maintain a regular schedule; to perform complex tasks independently; and to adequately relate with others when necessary.

---

[8] "Decompensation" is psychiatrically defined as a failure of defense mechanisms resulting in progressive personality disintegration. *Dorlands* at 432.

7

Dr. Broska found that Diaz would not always appropriately deal with stress, and could not be expected to always make appropriate decisions. (Tr. at 484, 285.) She stated that the results of her examination did not immediately reveal any symptoms significant enough to interfere with Diaz's ability to function daily. (Tr. at 485.)

### e. Dr. William Lathan

Dr. William Lathan conducted an internal medicine consultative exam of Diaz on March 15, 2011. (Tr. at 487-89.) Although Dr. Lathan noted that Diaz had been diagnosed with Hepatitis C in 2009, he reported that Diaz had a normal gait, full range of spinal motion, and no likely disc herniations.

### f. Dr. Gopal Narsimhan

Diaz underwent an esophagogastroduodenoscopy[9] with Dr. Gopal Narsimhan on October 20, 2011. In his report, Dr. Narsimhan diagnosed Diaz with a moderate hiatal herniation,[10] Grade A esophagitis,[11] moderate gastritis,[12] erythematous mucosa,[13] an acute duodenal[14] ulcer, and an ulcerated area at the anterior wall of the duodenal bulb (Tr. at 772-92.).

### g. Physical RFC conducted by Dr. J. Labusohr

Diaz underwent a physical RFC assessment conducted by Dr. J. Labusohr on April 26, 2011. (Tr. at 505-10.) Dr. Labusohr determined that Diaz can occasionally lift up to fifty pounds, can frequently lift up to twenty-five pounds, can stand and walk for six hours of an eight-hour workday, can sit for six hours of an eight-hour workday, and has no pushing or pulling restrictions. (Tr. at 506.) Dr. Labusohr did not find any postural, manipulative, visual,

---

[9] "Esophagogastroduodenoscopy" is defined as an endoscopic examination of the esophagus, stomach, and duodenum. *Dorland's* at 581.
[10] "Hiatal herniation" is defined as a herniation of an abdominal organ. *Dorland's* at 758.
[11] "Esophagitis" is defined as inflammation of the esophagus. *Dorland's* at 580.
[12] "Gastritis" is defined as an inflammation of the stomach. *Dorland's* at 680.
[13] "Erythematous Mucosa" is defined as an irritation of the mucosal lining of the gastrointestinal tract due to capillary congestion. *Dorland's* at 576, 1062.
[14] See footnote three.

8

communicative, or environmental limitations. (Tr. at 507-08.) He determined that Diaz possessed a physical RFC necessary to perform medium work.

### h. Mental RFC conducted by Dr. E. Kamin

Diaz underwent a mental RFC assessment conducted by Dr. E. Kamin on April 28, 2011. (Tr. at 511-27.) Dr. Kamin diagnosed Diaz with an unspecified affective disorder, which placed a mild restriction on activities of daily living, a mild restriction on maintaining social functioning, and a mild restriction on maintaining concentration, persistence or pace without repeated episodes of deterioration. (Tr. at 514, 521.) Dr. Kamin diagnosed Diaz with depressive disorder, and found him to possess moderate limitations in his ability to: 1) understand and remember detailed instructions; 2) carry out detailed instructions; 3) complete a normal workday and workweek without interruptions from psychologically-based symptoms; 4) perform at a consistent pace without an unreasonable number and length of rest periods; 5) accept instructions and respond appropriately to criticism from supervisors; and 6) respond appropriately to changes in the work setting. (Tr. at 525-26.) As a result, she found Diaz to be capable of performing semi-skilled work. (Tr. at 527.)

## C. The ALJ's Findings

On July 11, 2012, ALJ Solomon issued a decision stating that Diaz was not disabled under § 1614(a)(3)(A) of the Social Security Act since the date his application for benefits. (Tr. at 28.) In his decision, the ALJ found that Diaz met the insured status requirements of the Social Security Act through December 31, 2004, and that Diaz had not engaged in substantial gainful activity since June 1, 2004. (Tr. at 23.) The ALJ additionally found Diaz to be suffering from Hepatitis C, hypertension, irritable bowel syndrome, major depressive and anxiety disorders, and of substance abuse in remission, and that these conditions constituted severe impairment. (*Id.*)

9

However, the ALJ found that Diaz did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

In making his decision as to listing impairments, the ALJ found that Diaz's mental impairments, considered singly and in combination, are most closely related to listing 12.04 regarding affective disorders. (Tr. at 24.) The ALJ argued that the record indicated that Diaz experienced only mild to moderate restrictions and difficulties in daily living, social functioning, concentration, persistence and pace; thus precluding him from being categorized according to listing 12.04, as it requires a finding of marked limitation in each of the stated categories. (*Id.*) Further, the ALJ found that Diaz failed to meet another requirement of the listing because the record did not indicate that he experiences episodes of decompensation of any extended period. (*Id.*)

The ALJ found Diaz had the RFC necessary to perform light work. In making this determination, the ALJ found that Diaz's conditions could be expected to cause the alleged symptoms, but he found Diaz not credible in his statements concerning the intensity, persistence and limiting effects of these symptoms. (Tr. at 25.) The ALJ relied in part on Diaz's own testimony that he can travel by himself, enjoys his hobby, helps his mother with household chores, has a girlfriend, and maintains ties to friends. (*Id.*) The ALJ found that the claimed severity of Diaz's impairments was not consistent with the medical evidence or his personal testimony. (*Id.*)

In making his RFC determination (and his broader determination as to disability), the ALJ limited the weight given to the opinions of Diaz's treating psychiatrist, Dr. Luis Gonzalez. In doing so, the ALJ reasoned that Dr. Gonzalez's opinions regarding Diaz's mental residual

capacity are inconsistent with his own treatment notes and mental status examination findings. (Tr. at 28.) Specifically, the ALJ pointed to inconsistencies between Dr. Gonzalez's report of January 6, 2012, and his report of March 12, 2012, in which he seems to contradict himself in several categories as to whether Diaz's restrictions are "moderate" or "marked." (*Id.*) Instead, the ALJ in his mental RFC assessment relied heavily on the FEGS psychosocial assessment of Diaz, as well as the records of the consultative examiners. (Tr. at 25-27.)

The ALJ found that Diaz is no longer able to perform his past work as a laborer because he is limited to less than the full range of light exertional work. (Tr. at 29.) He also found that Diaz is a younger individual as defined by 20 C.F.R. § 404.1563 and § 416.963, that he has a limited education and is able to communicate in English, and that he has no transferable job skills because his past relevant work was unskilled. (*Id.*)

The ALJ found that, based on the record and the testimony of the vocational expert, there are jobs that exist in significant numbers in the national economy that Diaz can perform. (*Id.*) Specifically, the ALJ found that considering Diaz's age, education, work experience, and residual functional capacity, he is capable of successfully adjusting to the work of a mail clerk, a laundry bagger, or a messenger. (Tr. at 30.) As a result, the ALJ found that Diaz had not been under a disability, as defined in the Social Security Act, from June 1, 2004, to the date of the ALJ's decision. Based upon his findings, the ALJ denied Diaz's application for disability insurance benefits, (*Id.*) and the Appeals Council declined to review the decision. (Tr. at 1-7.)

### III. DISCUSSION

#### A. Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3).

11

Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); accord *Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); accord *Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); accord *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). See, e.g., *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is

substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); accord *Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. See *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any

determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

When "new and material evidence" is submitted, the Appeals Council may consider the additional evidence "only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). "New evidence" refers to "any evidence that has not been considered previously during the administrative process." *Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009).

## B. Determination of Disability

### 1. Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the

claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999). While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty

performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG), 2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility determination). In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

### 2. The Treating Physician Rule

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)

16

(discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must attempt to fill any clear gaps in the administrative record, *Burgess*, 537 F.3d at 139, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician.

Second, the ALJ must give advance notice to a pro se claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the pro se claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, No. 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

Third, the ALJ must explicitly consider various "factors" to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6).

Fourth, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. See 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

17

Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

## C. Issue on Appeal

### 1. The ALJ properly limited the weight given to Dr. Gonzalez's opinions

The ALJ properly analyzed and limited the weight given to the medical source opinions of Dr. Gonzalez under the standards set forth in the treating physician rule. The ALJ found that Dr. Gonzalez's conclusions were 1) inconsistent with his own treatment notes and findings, 2) inconsistent with Diaz's conservative treatment history, and 3) inconsistent with Diaz's own testimony. (Tr. at 28.)

The Commissioner of Social Security argues in her Memorandum of Law in Support of her Motion for Judgment on the Pleadings ("Def. Mem.") that the ALJ acted properly in limiting the weight given to Dr. Gonzalez's opinions because his opinions were not supported by the record evidence or were contradicted by Diaz's own testimony. (Def. Mem. at 21.)

The report and questionnaire produced by Dr. Gonzalez are facially inconsistent with themselves and the remainder of his treatment notes. Diaz's testimony further contradicted Dr.

Gonzalez's findings as to marked limitation. The Social Security Act defines a "marked limitation" as an "impairment [that] interferes seriously with [a claimant's] ability to independently initiate, sustain, or complete activities." § 416.926a(e)(ii)(2)(i).

Diaz testified to dressing, bathing and feeding himself without assistance, as well to taking public transportation alone. (Tr. at 56-57.) He testified that he enjoys artistic activities and spending time with his girlfriend on the weekends. (Tr. 58-59.) Diaz testified that he enjoys laughing and watching television. (Tr. at 61.) Each of these statements tends to negate the claim that Diaz experiences functional limitation to a degree justifying a finding of marked limitation according to the statutory definition. The ALJ properly considered this, together with the internal inconsistency of Dr. Gonzalez's findings, when he limited the weight given to Dr. Gonzalez's conclusions.

Prior to making his decision, the ALJ succeeded in developing a longitudinal picture of Diaz's claimed disabilities as he was required to do by § 404.1520a(c)(1). Aside from Dr. Gonzalez's records, the ALJ reviewed records from seven different medical sources, including two other treating sources. The ALJ afforded full weight to the treating source records of Dr. Luiza Guseynov and FEGS, both of whom began treating Diaz in 2010. The records produced by Dr. Guseynov speak primarily to Diaz's physical conditions, and those of FEGS speak primarily to Diaz's mental conditions. These records were considered by the consultative examiners when they produced their reports, which the ALJ also considered. The medical record as a whole, together with Diaz's testimony, sufficiently established the "complex" and "highly individualized" longitudinal picture of Diaz's functional limitations as was required by the statute. (*Id.*)

Because the ALJ's findings as to Dr. Gonzalez were supported by substantial record evidence, and because the decision to limit the weight given to his opinions did not prevent the ALJ from effectively developing a longitudinal picture of Diaz's impairments, I recommend that the case be dismissed.

## IV. CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's motion be **GRANTED** and that the Complaint be **DISMISSED.**

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections will be filed with the Clerk of the Court and served to all adversaries, with extra copies delivered to the chambers of the Honorable Jesse M. Furman, 40 Foley Square, Room 2202, and the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See Thomas c. Arn*, 474 U.S. 140, 149-150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1)(c) (West Supp. 1995); Fed. R. Civ. P. 72(a), 6(a), 6(d).

**DATED: March 13, 2015**
**New York, New York**

                                                           **Respectfully Submitted,**

                                                         **The Honorable Ronald L. Ellis**
                                                         **United States Magistrate Judge**